Ex parte Henry Doyle SHUFLIN, Jr.

No. 50693.

Court of Criminal Appeals of Texas.

Oct. 22, 1975.

Will Gray, Houston, for appellant.

Carol S. Vance, Dist. Atty., James C. Brough, Asst. Dist. Atty., Houston, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

BROWN, Commissioner.

This is a post conviction habeas corpus proceeding under Article 11.07, V.A.C.C.P.

On October 19, 1973, the petitioner, represented by retained counsel, plead guilty to the offense of murder with malice in Cause No. 177,987. He was sentenced to a term of twenty-five years. On May 20, 1975, petitioner filed an application for a writ of habeas corpus in the 179th District Court of Harris County, claiming that he plead guilty to murder with malice as a result of judicial coercion. The Hon. I. D. McMaster, who was the presiding judge in the original case, entered an order directing that an evidentiary hearing be held. An evidentiary hearing was held on June 10, 1975 before the Hon. Fred Hooey, sitting as judge of the 179th District Court of Harris County, pursuant to Art. 199a, Section 2.002(b), V.A.C.S., and *Gregory v. State*, 495 S.W.2d 891 (Tex.Cr.App.1973). At the close of the hearing the petitioner requested the trial court prepare findings of fact and conclusions of law.

The following findings of fact were made by the trial court:

"1) Petitioner was convicted of the felony offense of Murder with Malice, on October 19, 1973, in Cause No. 177,-987, styled *THE STATE OF TEXAS vs. HENRY DOYLE SHUFLIN, JR.*, in the 179th District Court of Harris County, Texas, Honorable I. D. McMaster, presiding. Punishment was assessed at twenty-five years imprisonment. Appellant was sentenced accordingly.

"2) Appellant was represented by retained counsel, Stuart Kinard, at and prior to his trial, and by assistant counsel, Terry Gaiser, prior to trial but not at time of trial.

"3) At the time of his trial, applicant waived his right to trial by a jury and received all admonitions and determinations required by law, and entered a plea of guilty before the Court.

"4) Applicant's guilt was proved by competent evidence.

"5) Prior to trial on the plea of guilty to the Court, the same judge had heard evidence for three weeks on pre-trial motions respecting the same case, had presiding (sic) over selection of a jury in said case, which was never sworn, had then presided over a hearing on change of venue in said case, had agreed to order a change of venue, but postponed said act pend-

ing assignment of a county of trial by the presiding judge.

"6) Change of venue was scheduled to be formally ordered on October 19, 1973.

"7) Judge I. D. McMaster was expected to preside at trial after a change of venue.

"8) Before a change of venue was formally ordered, Applicant entered his plea of guilty before the Court on October 19, 1973.

"9) During the pre-trial period before October 19, 1975, (sic) plea bargaining had occurred between Assistant District Attorney Jack Bodiford and Applicant's attorney, Mr. Kinard.

"10) Mr. Kinard had communicated to his client, Applicant here, offers, if a plea of guilty were entered, of recommendation of punishment ranging from seventy-five years down to twenty-five years, all of which had been refused by Applicant.

"11) During the pre-trial hearings, selection of jury and change of venue hearing, Judge McMaster was favorably impressed by the conduct and demeanor of Applicant Shuflin, and Judge McMaster so stated to Applicant Shuflin's attorney Mr. Kinard, during informal out-of-court conversation.

"12) Mr. Kinard then asked Judge McMaster if the judge would be willing to state his favorable impression of applicant in a letter to the Board of Pardons and Paroles, with recommendation for an early parole for Applicant. Judge McMaster expressed his willingness to do this, at the time Applicant becomes eligible for parole.

"13) Mr. Kinard then requested that the judge write the letter, undated, and give it to Mr. Kinard for Applicant, to guard against the possibility of the event of the judge's death prior to time of Applicant's eligibility for parole.

"14) This the judge agreed to do.

"15) At the time these occurrences transpired, Applicant had still rejected all plea bargains.

"16) Judge McMaster attached no condition, directly or indirectly, to his offer to write this letter.

"17) On October 18, 1973, with a formal change of venue scheduled for the following day, Mr. Kinard, with Applicant's father, consulted with Applicant, evaluating his situation, and recommended that Applicant accept the twenty-five year offer and plead guilty, Mr. Kinard expressing the opinion that the letter Judge McMaster would write would have an impact upon the Board of Pardons and Paroles, and Applicant's father expressing confidence in Mr. Kinard.

"18) Applicant refused to enter a plea of guilty until Mr. Kinard telephoned Mr. Gaiser, Applicant's former assistant counsel, in whom Applicant had confidence, but after that was done, and Applicant received a report on that conversation, Applicant decided to enter a plea of guilty.

"19) Mr. Kinard had previously investigated the time schedules on parole availability, and had informed Applicant that if he had a twenty-five year sentence, he could, with credit for his back jail time and with certain conduct and diligence, be eligible for parole in about three years. This was based on the computation that he could build eight years credit in four years and four months.

"20) Applicant hoped, with the advantage of a letter from the trial judge, to get parole when he first became eligible.

"21) Mr. Kinard also made it clear to Applicant Shuflin that Applicant would also need to get a letter recommending parole from the District Attorney's Office and from the Sheriff of Harris County.

"22) On the morning of October 19, 1973, prior to Applicant's entry of his plea of guilty, Mr. Kinard informed Assistant District Attorney Jack Bodiford that Judge McMaster was going to write a letter recommending early parole for Applicant Shuflin, and asked Mr. Bodiford if he would do the same, to which Mr. Bodiford replied that he would recommend Applicant never receive parole.

"23) Mr. Bodiford's position, thus made clear to Applicant's counsel, was based on his evaluation of Applicant; Mr. Bodiford's conclusions as to Applicant's qualities being different from those of Judge McMaster.

"24) On the morning of October 19, 1973, prior to the entry of Applicant's guilty plea, Judge McMaster did write and deliver to Mr. Kinard the undated Letter which is Applicant's Exhibit No. Two, which extols Applicant's good qualities and expresses the opinion that Applicant 'assuming that he had been a good inmate, should be given serious and favorable consideration for early release under our parole law.'

"25) Judge McMaster in this letter expressed his true convictions and he would have been willing to write a similar letter if Applicant had pleaded not guilty to a jury.

"26) Any hope of Applicant's likely receipt of early parole which Mr. Kinard had imparted to Applicant was in accordance with that lawyer's research and was a genuine hope, as correct as Mr. Kinard could make it.

"27) Before Applicant entered his plea of guilty, Judge McMaster admonished Applicant in accordance with Article 26.13 of the Code of Criminal Procedure of Texas. Applicant's replies are those required to authorize acceptance of a plea of guilty, and they were true.

"28) Judge McMaster did not engage in any plea bargaining in this case and did not attempt to influence Applicant's plea of guilty, not guilty, or nolo contendere by his willingness to write a letter aimed at helping Applicant get early parole.

"29) Applicant did not have any reason, from his attorney, to believe the letter was conditioned upon a plea of guilty."

In his brief the petitioner asserts four distinct yet very closely related contentions. All involve the trial judge's action in writing the undated letter to the Board of Pardons and Paroles before the petitioner entered his guilty plea. First, petitioner contends that it was fundamentally unfair for the trial judge to enter plea negotiations before an agreement had been reached. Second, the petitioner contends that his plea of guilty was entered because of promises and inducements made by the trial judge in violation of the provisions of Art. 26.13, V.A.C.C.P. Third, the petitioner contends that his guilty plea was obtained in violation of the due process clause of the Fourteenth Amendment to the United States Constitution. The petitioner's fourth and final contention is that his plea of guilty was involuntary and the result of judicial coercion.

We will deal initially with the petitioner's last two contentions; namely, that his plea of guilty was the result of judicial coercion and resulted in a denial of due process. The record of the evidentiary hearing reveals the following admission by the petitioner:

"Q   Well, did anybody promise you that you would, in fact, receive an early parole from the Board of Pardons and Paroles if you entered a plea of guilty?

"A   I believe that with the letter, sir, from Judge McMaster that I would, yes, sir.

"Q   But did anybody promise you that?

"A   Sir?

"Q Did anybody promise you that?

"A No, sir.

"Q Did anybody promise you that the Governor would pardon you if you entered a plea of guilty?

"A No, sir.

"Q Did you think that you would receive a parole if you entered a plea of guilty? Not what you hoped, but did anyone promise you that?

"A No, sir.

"Q And is it your testimony that Mr. Kinard told you that you would be sworn before you entered your plea of guilty, and then in open Court you would state to the judge that you had not been promised anything such as a pardon from the Governor, or any early parole, or that you were not entertaining any delusive hope of pardon or parole from the Governor at the time, and that you would tell Judge McMaster, 'No, I do not have any such beliefs as that,' Is that what you are saying?

"A Yes, sir.

"Q Did you have any further conversations concerning your guilty plea on the morning of the 19th when you did, in fact, enter your plea of guilty?

"A No, sir, other than the fact that I had asked Mr. Kinard if he had the letter, and he showed it to me.

"Q Did he tell you on the 18th that the judge had already said that he would write the letter out at the Rehabilitation Center?

"A Yes, sir.

"Q Now, I believe you said also that as part of your negotiations and conversations with Mr. Kinard on the 18th out at the Rehabilitation Center, that you were told that you would have to have a letter from the District Attorney's office and one from the Sheriff's office as well as from the Judge?

"A No, sir, not on that occasion. I understood that at an earlier conversation at sometime in the jury room, that before I could make parole I would have to have all three.

"Q So then when you entered your plea of guilty you knew, of course, at that time that Judge McMaster had written the letter to the Board of Pardons and Paroles; you knew that, didn't you?

"A Yes, sir.

"Q And you also knew that there had been no letter written from the District Attorney's office recommending an early parole for you? You knew that?

"A Yes, sir.

"Q Did you know that I would not write such a letter? Did you know whether I was asked to write such a letter by Mr. Kinard?

"A No, sir.

"Q But you also, of course, knew that there was no letter written from the Sheriff's Department to the Board of Pardons and Paroles. Did you know that?

"A Yes, sir.

"Q Now as I understand your frame of mine at the time that you entered the plea of guilty, you did entertain a hope of an early parole based upon the fact that Judge McMaster had written that letter, is that correct?

"A Yes, sir, that it would help me make an early parole.

"Q And you knew that no letter from the District Attorney's office or the Sheriff's Department had been written?

"A Yes, sir.

"Q Tell me in your own words what you believed with respect to an early parole at the time you entered a plea of guilty?

"A    I believed, sir, that with that letter in my possession that it would be easier for me to get a parole at the time that I became eligible for parole."

*Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747, established the standard to be used in determining the voluntariness of a plea of guilty.

"A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e. g. bribes)." Citing *Shelton v. United States*, 246 F.2d 571 (5th Cir. 1957). . . . "The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision."

The case of *Brown v. Peyton*, 435 F.2d 1352 (4th Cir. 1970) is in point. In *Brown* the petitioner contended that the participation of the trial judge in plea bargaining negotiations rendered involuntary his subsequent plea of guilty. The petitioner in *Brown* urged the court to adopt a rule which would bar the participation of the trial judge in plea negotiations and render any plea resulting from judicial participation per se involuntary. This the Fourth Circuit declined to do. After discussing the implications of *Brady v. United States*, supra, the Court reached the following conclusion:

"The Supreme Court's decision in *Brady* provides the standard by which reviewing courts may now measure any promises which might have induced the defendant's guilty plea. Simply because the promise made by the judge induced the defendant to plead guilty does not make that plea involuntary, rather, the promise must be of the prohibited type to affect the voluntariness of the defendant's plea." *Brown v. Peyton*, 435 F.2d 1352 (4th Cir. 1970).

■ Assuming for the moment that the trial judge did participate in the plea negotiations it is clear from the record before us that the defendant's plea of guilty when measured against the standards of *Brady v. United States*, supra, and *Brown v. Peyton*, supra, was voluntarily entered into and was not the result of judicial coercion. It is also clear when measured against the same standards that the petitioner's plea of guilty was not obtained in violation of the due process clause of the Fourteenth Amendment to the United States Constitution. Petitioner's third and fourth contentions are without merit.

■ Petitioner's second contention is that his plea of guilty was entered because of promises and inducements made by the trial judge contrary to the provisions of Art. 26.13, V.A.C.C.P. The record does not support the petitioner's contention. At the evidentiary hearing the petitioner testified as follows on cross-examination:

"Q    Well, so that the record is clear, you stated a while ago that no one had promised you anything to get you to plead guilty, is that true?

"A    Yes, sir.

"Q    So when you stood before the Court and he admonished you as to your plea of guilty, you were telling him the truth when he asked if you had been promised a pardon from the Governor that prompted you to confess your guilt. You were telling him the truth weren't you?

"A    Yes, sir.

"Q    And do you remember if he asked you if your plea had been influenced by any considerations of fear, or by any persuasion, or any delusive hope of pardon prompting you to confess

your guilt? When you answered him no, you were telling him the truth, weren't you? You had not been promised any of those things?

"A No."

Petitioner's second contention is simply not supported by his own testimony.

■ We turn now to the petitioner's allegation that it is fundamentally unfair for the trial judge to enter the plea negotiations. Petitioner's allegations assume that Judge McMaster did, in fact, enter the plea discussions. The findings of fact from the evidentiary hearing conclude that Judge McMaster did not enter the plea negotiations by offering to write a letter recommending early parole. At the evidentiary hearing Judge McMaster testified that his offer to write a letter on behalf of the petitioner was in no way conditioned on the petitioner's plea of guilty. He stated that he would have written the letter without regard to the petitioner's decision to accept or reject the prosecution's offer of twenty-five years. Mr. Kinard, the petitioner's attorney at the time of his plea of guilty, testified that the offer of Judge McMaster was not conditioned on the petitioner's willingness to plead guilty. Mr. Kinard further testified that he explained the operation of the parole laws to his client, including the fact that petitioner would have to obtain letters from both the prosecuting attorney and the sheriff, in addition to the one from the trial judge, if he hoped to obtain an early parole. Mr. Kinard also stated that it was his recommendation that his client accept the offer of twenty-five years. The petitioner conceded that the requirements for early parole were explained to him by his counsel and that he understood that early parole was in no way guaranteed by the letter from Judge McMaster.

In *Kincaid v. State*, 500 S.W.2d 487 (Tex. Cr.App.1973) this Court stated:

"It would have been unjudicial and contrary to public policy for the trial judge to commit himself as to his decision prior to the hearing. Our system contemplates that decisions are to be reached after evidence and argument of counsel and not before. As experienced trial lawyers, appellant's counsel must have been aware of this, and were charged with upholding the integrity and the justice of our judicial process. They should not have sought or expected the trial judge to commit himself in advance of the hearing." (Footnotes omitted)

This case was briefed and argued by both the petitioner and the State in terms of the trial judge's participation, or not participation in the plea discussion process. This may be an imprecise analysis of the issue. Rather what is at issue is the effect of the trial judge's apparent pre-judgment of the petitioner. The petitioner had maintained his plea of not guilty throughout the lengthy pre-trial hearing, the jury selection, and the change of venue hearing. The petitioner also knew that the trial judge would accompany the case after the change of venue was granted. It was in this context that the offer to write to the Board of Pardons and Paroles was made known to the petitioner. Only then did he decide to change his plea from not guilty to guilty. When viewed through the eyes of a layman, this could be interpreted to mean that the judge had already determined in his own mind that the petitioner would be convicted, even before the trial began. If the petitioner viewed the judge's action in this way, would not a continued plea of not guilty only result in a longer sentence and reduced chances of early parole?

The record before us, however, indicates that the petitioner was not a neophyte in the criminal justice system. The record also shows that he was carefully advised by competent counsel at every step in the proceeding. Therefore, whether viewed as plea bargaining or not, the plea of guilty entered by the petitioner was not the result of fundamental unfairness and no harm is shown to the petitioner.

The American Bar Association's standards relating to pleas of guilty and the

function of the trial judge (not adopted by this State) provide excellent guidance. These standards provide that the trial judge should not participate in plea discussions until tentative agreement has been reached.[1] This is to avoid even the appearance of judicial coercion or prejudgment of the defendant by the court. The commentary accompanying the standards explains the reasons why a trial judge should not inject himself into the plea discussion process.[2]

We conclude that the record before us supports the findings of fact made at the evidentiary hearing.

We recognize that compassion for another human being is an admirable trait in any person. In a judicial officer compassion is an especially worthy characteristic though it must not overcome that evenhanded impartiality which is required of a trial judge.

█ It is only after the trial judge has passed on the evidence and the plea of the defendant that he can allow himself to express his personal offer of assistance to the defendant. The proper practice is for the trial judge to carefully avoid participation or the appearance of participation in plea discussions or negotiations until such time as an agreement has been reached.

Having concluded that the findings of the trial court at the evidentiary hearing are supported by the record, petitioner's requested relief is denied.

Opinion approved by the Court.

DOUGLAS, J., not participating.

plore with each other the possibility of disposition without trial."

1. ABA Standards relating to the Administration of Criminal Justice, Pleas of Guilty, Section 3.3(a) (Approved Draft 1968) provide that:

"The trial judge should not participate in plea discussions."

See also ABA Standards relating to the Administration of Criminal Justice, Function of the Trial Judge, Section 4.1(a) (Approved draft 1972) which provides that:

"The trial judge should not be involved with plea discussions before the parties have reached an agreement other than to facilitate fulfillment of the obligation of the prosecutor and defense counsel to ex-

2. See commentary accompanying Section 3.3(a), ABA Standards relating to the Administration of Criminal Justice, Pleas of Guilty. We also take note of the Code of Judicial Conduct of the Judiciary of the State of Texas. Canon 2 admonishes the judge to "avoid impropriety and the appearance of impropriety in all his activities." Canon 3 A.(4) provides in part that: "A judge should . . . neither initiate nor consider *ex parte* or other private communications concerning a pending or impending proceeding."